**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

SCOTLAND WILLIAMS,                    *

Plaintiff                             *

v                                     *         Civil Action No. ELH-13-2561

SECRETARY, DPSCS GARY D. MAYNARD,     *
 et al.
                                      *

Defendants

                                    ***

## MEMORANDUM

Self-represented plaintiff Scotland Williams, a Maryland prisoner incarcerated at North Branch Correctional Institution ("NBCI"), has filed suit pursuant to 42 U.S.C. § 1983, alleging violations of his rights under the Eighth Amendment.  ECF 1.  He names a host of defendants: Gary D. Maynard, as Secretary of the Department of Public Safety and Correctional Services ("DPSCS"); Deputy Secretary of Operations J. Michael Stouffer; Warden Bobby Shearin; Warden Frank B. Bishop, Jr.; Sgt. Brett E. Payton; CO II Scott P. Biggs; CO II Robert R. Holler; CO II Kenneth W. McDowell; CO II Richard A. Porter; and CO II Phillip D. Tasker.  ECF 19.[1] Defendants have filed a motion to dismiss or, in the alternative, for summary judgment (ECF 19, the "Motion").  The Motion is supported by a memorandum and several exhibits.  Plaintiff has not filed a response.[2]

---

[1] The Court notes that Maynard is no longer the Secretary of DPSCS, and Shearin is no longer the Warden of NBCI.

[2] Pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), on March 31, 2014, plaintiff was notified that defendants had filed a dispositive motion, the granting of which could result in the dismissal of this action.  ECF 20.  Plaintiff was also informed that he was entitled to file materials in opposition to that motion within seventeen days from the date of that letter, and that his failure to file a timely or responsive pleading or to illustrate, by affidavit or the like, a genuine dispute of material fact, could result in the dismissal

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, defendants' Motion, construed as a motion for summary judgment, shall be granted.

## Factual Background

Plaintiff alleges that he is serving two life sentences without parole, plus 70 years.  ECF 1 at 4.[3]  He claims that he has "been single-celled for over 15 years because psychologist[s] feel he presents a danger to himself and others."  *Id*.  Moreover, plaintiff claims he is "legally blind" and "suffers from a seizure disorder."  *Id*.  According to plaintiff, his medically prescribed eyeglasses were improperly confiscated by correctional staff while he was at Western Correctional Institution ("WCI").  ECF 1 at 7-8.

By way of background, plaintiff explains that on September 30, 2011, he was transferred to WCI from NBCI.  *Id*. at 4.  Plaintiff states that, pursuant to psychologist orders at NBCI, he was assigned to a single cell.  He indicates that he advised the WCI escort officers that he was "'on single-cell status,'" *id*. at 4, but they advised him that the NBCI psychologist had "'no say'" over his cell assignment at WCI.  *Id*. at 5.

Plaintiff was assigned to a double cell with Inmate Aaron Scott, on administrative segregation, in "extremely tight quarters," where the two were confined for 23 hours a day.  *Id*. at 5.  He told Scott that "the cell was not big enough for the both of them."  *Id*.  According to

---

of his case or in the entry of summary judgment, without further notice of the court.  *Id.*  Plaintiff sought and received several extensions of time to respond.  ECF 21, 22, 24, 25, 27 & 28.  On October 27, 2014, plaintiff sought copy work, indicating he had filed a response to the dispositive motion on September 19, 2014.  ECF 29.  He also asked for a copy of the docket sheet to insure the court had received his response.  A copy of the docket sheet was mailed to plaintiff the following day.  *See* staff note of October 28, 2014.  Nothing further has been received from plaintiff.

[3] Citations to page numbers are to the page numbers generated by the electronic docket, which do not always correspond to the page numbers on the documents.

plaintiff, he "fashioned a weapon out of razors and decided he would cut [Scott's] throat and any other inmate WCI dared double-cell him with." *Id*. at 5.

Later, Officers McDowell and Hollers removed Scott and plaintiff from the cell to escort them for showers.  Plaintiff advised Hollers that the cell was too small and he wanted to speak with the shift supervisor.  Hollers declined the request.  *Id*. at 5.  Plaintiff then broke away from Hollers and "ran down the tier with the intent of speaking to the shift supervisor," but he was "grabbed" by Hollers and Officer Tasker.  *Id*. at 5-6.  They "dragged" him into a back room and "shoved him against the wall while shouting obscenities and threats."  *Id*. at 6.  Plaintiff states that other unidentified officers came behind him and punched him repeatedly, asking what his problem was.  *Id*.  When he replied that he was "'not suppose[d] to be double-celled,'" the officers "were not satisfied" with his response and "collapsed him face down on the floor grabbing his legs and handcuffed arms to carry him back to the cell."  *Id*. at 6.  Plaintiff states that he struggled with the officers as they carried him back to the cell, and said, "'I'm gonna file a lawsuit on all of you first chance I get if you dirty pigs put me back in that cell.'"  *Id*.  According to plaintiff, an unidentified officer then knelt on his back and said, "'You can't sue, what you can't see'" and removed plaintiff's eyeglasses.  *Id*.  Plaintiff was then "thrown" into his cell.  *Id*.

Plaintiff claims that he asked Officer Payton to return his eyeglasses.  *Id*. at 7.  However, he was told his attitude regarding double-celling and threats regarding lawsuits "won't get his eyeglasses back."  *Id*. at 7.

Plaintiff admits that he "pulled the razor weapon he made from his shirt" and told Payton that he "'was gonna cut Scott's throat'" when he returned to the cell.  *Id*.  In response, Payton

sprayed plaintiff with "mace." *Id.*[4]  Plaintiff dropped his weapon and was removed from the cell to "special observation housing (S.O.H.) suicide watch." *Id.*

On October 4, 2011, plaintiff was released from suicide watch.  He states that he made numerous requests for the return of his eyeglasses but was advised that it was up to the Warden whether he would receive them "because plaintiff was labeled a trouble maker." *Id.*  On October 6, 2011, plaintiff was transferred on an emergency basis back to NBCI.  *Id.*  He states that he believes he was transferred because of his threat of filing law suits and his unruly conduct.  *Id.*

A week after plaintiff returned to NBCI, all of his property was returned to him except the eyeglasses. *Id.* at 8.  According to plaintiff, without his glasses, his vision "falls within the parameters of a definition of blindness." *Id.*

On October 17, 2011, plaintiff submitted a sick call slip seeking replacement of the confiscated glasses. *Id.* at 8.  He received replacement glasses on January 23, 2012. *Id.*  Plaintiff states that as a result of being without his glasses for a few months, he experienced impairment of his regular activities, reading, writing, recognizing people, etc. *Id.*  He also states he suffered anxiety and unremitting severe and debilitating headaches, which he believes caused neurological damage and resulted in his being found unconscious and diagnosed with a seizure disorder in February 2012. *Id.*  He is currently taking anti-seizure medication. *Id.*

Further, plaintiff claims he has exhausted his administrative remedies, beginning in November 2011. *Id.* at 9.  His grievance was dismissed. *Id.*

Defendants indicate that on September 30, 2011, Sgt. Payton was the Officer in Charge of Housing Unit 5, which houses inmates on segregation.  *See* ECF 19-3 (Declaration of Payton), Ex. B at 2.  In his Declaration, Payton recounts that at approximately 6:50 p.m. on September 30,

---

[4] Defendants assert that pepper spray, not mace, is used in Maryland prisons.  ECF 19-1 at 3 n.1.  This discrepancy is not material.

2011, McDowell and Holler removed plaintiff and Scott from their cells for their showers.  As they exited the cell, plaintiff broke away from Holler and ran down the tier where Tasker tried to stop him by grabbing his arm.  Plaintiff fell to the floor.  *Id.*  Tasker and Holler got Williams to his feet and escorted him behind door 6 to regain control of Williams.  *Id.* at 3.  Payton left the Control Center and joined the officers subduing plaintiff.  He tried to talk to Williams but Williams would not answer any questions.  *Id.*  Payton avers that none of the officers struck plaintiff or used profane language toward him.  Payton directed Tasker and Holler to return plaintiff to his cell.  Plaintiff became combative during the escort to his cell and the officers needed to carry him to the cell, with Holler taking hold of one leg and Payton the other.  *Id.*

Thereafter, Payton spoke to plaintiff's cellmate, Aaron Scott, who advised that plaintiff had been saying "'crazy things'" ever since plaintiff entered the cell.  *Id.*  Payton returned to plaintiff's cell to check on plaintiff and "saw him holding a home-made weapon" and "threatening to cut himself."  *Id.*  Payton directed plaintiff to drop the weapon but plaintiff refused to comply.  *Id.*  Payton again directed plaintiff to drop the weapon and warned that he would be pepper sprayed.  *Id.*  Plaintiff again refused.  Payton then "applied a burst of pepper spray through the feed-up slot," and plaintiff "immediately dropped the weapon on the floor.  *Id.*  Williams was then secured and escorted to the medical unit by Tasker and Payton, where he was examined by Nurse Browning,  and treated for exposure to pepper spray.  *Id.* at 4.  The medical records, ECF 19-2, Ex. A at 22-23, reflect that plaintiff was seen on September 30, 2011, by Ryan Browning, LPN.  Williams was "covered in pepper spray" but "no injuries [were] noted and no injuries were voiced…."  *Id.*  at 22.

Plaintiff was placed in Special Observation Housing (SOH) at the direction of Shane Weber, Supervisor of the Psychology Department at WCI.  ECF 19-2 at 6.  Weber avers in his

Declaration that inmates like plaintiff who are placed in SOH due to threats of self-harm or because they have demonstrated the ability to make a weapon are not allowed to possess items that could be made into weapons.  ECF 19-5 (Weber Declaration), Ex. D at 2-3.  Such items include the arms and lenses of eyeglasses, pencils, pens, plastic cups, plastic eating utensils, or other similar items.  *Id*. at 3.  According to Weber, eyeglasses have been used by inmates to make weapons.  *Id*.  Therefore, eyeglasses are confiscated from any inmate placed in SOH on a suicide watch, along with all other property in the inmate's possession.  *Id*.  Inmates in SHO on suicide watch are visually checked by staff every fifteen minutes.  Psychology staff determines when it is safe to release the inmate from SOH and return him to regular housing.  *Id*.

Additionally,  Payton avers that plaintiff did not threaten, in his presence, to file a lawsuit against him or any other staff.  ECF 19-3 at 4.  Payton and Holler both aver that they did not confiscate plaintiff's glasses, and did not observe any other staff take plaintiff's glasses.  ECF 19-3 at 4; ECF 19-4 (Declaration of Holler), Ex. C at 3.  And, Holler denies speaking to plaintiff about his single cell status or plaintiff's desire to speak to a supervisor.  ECF 19-4 at 2.  He avers that he did not have authority to order the change of plaintiff's cell but would not have denied him an opportunity to speak to a supervisor.  *Id*. at 3.  Further, Holler asserts that no officer involved in the incident used obscene or threatening language toward plaintiff, nor did any officer punch plaintiff.  *Id*.

Plaintiff was evaluated by medical staff on October 6 and 20, 2011, November 2, 2011, December 9, 13, 22, 27, 2011,  and January 6, and 12, 2012.  ECF 19-6 (Medical Records), Ex. E at 7, 8, 10, 13, 15-21, 23, 26-28.  At no time did he complain of headaches or other problems due to the confiscation of his eyeglasses.  *Id*.  On January 23, 2012, he received eyeglasses and reported, "They are good."  *Id*. at 29.

A Use of Force investigation was conducted as to the events of September 30, 2011.  See ECF 19-2 at 4-39.  Lieutenant Robert Gray concluded that the amount of force used and the method of use were consistent with established procedures.  *Id*. at 6.  Captain George W. Garlitz agreed.  *Id*. at 7.

### Standard of Review

Defendant's motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  ECF 19.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).   However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).  When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that  conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[5]

---

[5]  In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). And, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott*

---

Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

*v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit does not obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

As noted, plaintiff has not responded to the Motion. The court granted several extensions to plaintiff to submit his response. ECF 22, ECF 25, ECF 28. In addition, I granted several

requests of plaintiff for copy work.  ECF 23, ECF 26.  In correspondence from plaintiff dated October 27, 2014, ECF 29, plaintiff claims he submitted a response on September 19, 2014. And, staff notes entered on October 28, 2014, reflect that the docket sheet requested by plaintiff was mailed to him.  If plaintiff inspected the docket sheet, he would see that it shows that the court did not receive a response from plaintiff.  In light of the foregoing, I am satisfied that it is appropriate to address the defendants' Motion as one for summary judgment, as it will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id*. at 248.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must  'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in [his] favor without weighing the evidence or assessing the witness' credibility."  *Dennis v. Columbia Colleton Med. Ctr., Inc.*,

290 F.3d 639, 644-45 (4th Cir. 2002). *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not to "determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the court may not make credibility determinations on summary judgment. *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d 639 at 644-45. Indeed, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See*, *e.g.*, *Boone v. Stallings*, 583 F. App'x. 174 (4th Cir. 2014) (per curiam). However, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Anderson,* 477 U.S. at 248. On the other hand, a court should award summary judgment if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting

11

*Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## Discussion

### A.  Exhaustion of Administrative Remedies

The court must first examine defendants' assertion that, to the extent plaintiff's complaint can be construed as raising any claims other than a claim concerning the confiscation of his eyeglasses,  such claims must be dismissed due to plaintiff's failure to exhaust available administrative remedies.

The Prisoner Litigation Reform Act provides, in pertinent part, 42 U.S.C. §1997e:

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. § 1997e(h).  The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner.  Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by

defendants. *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

The DPSCS has made an administrative remedy procedure available to Maryland state prisoners, within the meaning of 42 U.S.C. § 1997e(a), for the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction ["DOC"]." Md. Code (2008 Repl. Vol., 2011 Supp.), § 10-206(a) of the Correctional Services Article ("C.S."); *see generally* C.S. §§ 10-201 *et seq.* Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance' to include a "complaint of any individual in the custody of the [DOC] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement." Code of Maryland Regulations ("COMAR") 12.07.01.01B(8).[6]

In the Maryland correctional system, if the particular institution in which an inmate is incarcerated provides an administrative remedy procedure, the inmate must complete the ARP

_____

[6] Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'" *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted). Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'" *Id.* at 651, 898 A.2d at 960 (citation omitted). Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id.*, nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC. *See Abramson v. Correctional Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000).

Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," C.S. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy. *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007). On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers. *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

process as a condition precedent to further review of the inmate's grievance.  *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D.  Filing a request for administrative remedy with the Warden of the Maryland prison in which one is incarcerated is the first of three steps in the Administrative Remedy Procedure  process provided by the Division of Correction to its prisoners. If this request is denied, the prisoner has ten calendar days to file an appeal with the Commissioner of Correction. If this appeal is denied, the prisoner has thirty days in which to file an appeal to the Inmate Grievance Office ("IGO").  *See* COMAR 12.07.01.03; 12.07.01.05.B; *see also* C.S. § 10-206.

Complaints are reviewed preliminarily by the IGO.  *See* C.S. § 10-207; COMAR 12.07.01.06.  If the complaint is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing.  C.S. § 10-207(b)(1).  The order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review.  C.S. § 10-207(b)(2)(ii).  However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings.  *See* C.J. § 10-208(c); COMAR 12.07.01.07-.08.  The conduct of such hearings is governed by statute.  C.S. § 10-208.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination.  However, a decision concluding that the inmate's complaint is wholly or partly meritorious constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge.  *See* C.S. § 10-209(b)-(c).

In either event, the final agency determination is subject to judicial review in Maryland state court, so long as the claimant has exhausted his/her remedies.  *See* C.S. § 10-210.  But, an

inmate need not seek judicial review in state court in order to satisfy the PLRA's administrative exhaustion requirement.  *See, e.g., Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir.) ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court."), *cert. denied*, 537 U.S. 949 (2002).

The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process.  *Chase v. Peay*, 286 F. Supp. 2d 523, 530 (D. Md. 2003), *aff'd,* 98 Fed. App'x. 253 (4th Cir. 2004); *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

Administrative remedies must, however, be available to the prisoner, and this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).  The Fourth Circuit addressed the meaning of "available" remedies in *Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008):

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that

remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id.* at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

As indicated, administrative remedies were available to plaintiff.  Therefore, as a prisoner, plaintiff is subject to the strict requirements of the exhaustion provisions.  *See Porter v. Nussle*, *supra,* 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). If defendants show that a claim is subject to the ARP process but has not been exhausted, the court may not consider the merits of the claim.  *See Jones v. Bock*, 549 U.S. at 220; *see also Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

Here, plaintiff filed an ARP on November 10, 2011, complaining that his eyeglasses were taken on September 30, 2011, and despite his request that his glasses be returned he had not received them. ECF 1-1, at 2; ECF 19-2 at 34.  Plaintiff's appeal to the Commissioner reiterated that his complaint was that his "eyeglasses were taken (i.e. confiscated, seized, withheld)" and he had to order replacement glasses.  ECF 1-1 at 8; ECF 19-2 at 43-44.  In his appeal to the IGO, plaintiff requested a hearing "to expose the retaliatory acts of the correctional staff."  ECF 1-1 at 10; ECF 19-2 at 45.  He does not elaborate as to the nature of those retaliatory acts.  *Id.*

Plaintiff exhausted his grievance as to his eyeglasses.  But, he made no other administrative complaints regarding the conduct of the correctional officers on September 30, 2011.  As such, to the extent his complaint here can be construed as raising claims of excessive force or failure to provide single cell status, those claims may not proceed, as plaintiff has plainly

failed to exhaust administrative remedies as to those issues.  The court shall only consider the issues raised in regard to the confiscation and loss of plaintiff's eyeglasses.

### B. Eighth Amendment Claim

The instant case concerns an allegation that correctional staff ignored valid medical orders regarding prescription eyeglasses by confiscating them.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of  its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act, amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Jackson v. Lightsey*, _____ F.3d _____, No. 13-7291, slip. op. at 15 (4th Cir. Dec. 18, 2014).  A "'serious… medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (*quoting Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Moreover, in a case

involving a claim of deliberate indifference to a medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 722 F.3d 340, 346 n.8 (4th Cir. 2014).

Inmates may also state an Eighth Amendment claim as to the conditions under which they are confined. Conditions that "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981). However, conditions that are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id.*

"In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that 'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that '*subjectively* the officials acted with a sufficiently culpable state of mind.'" *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called "punishment," and absent severity, such punishment cannot be called "cruel and unusual." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (*citing Wilson*, 501 U.S. at 298-300).

To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson*, 501 U. S. at 298. In other words, "the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. North Carolina Dept. of Corrections,* 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)). Conduct is not actionable under the Eighth Amendment unless it transgresses bright lines of clearly-established pre-existing law. *See Maciariello v. Sumner*, 973 F. 2d 295, 298 (4th Cir. 1992).

The objective prong of a conditions claim requires proof of an injury. "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993); *see Odom v. So. Carolina Dep't of Corrections*, 349 F.3d 765, 770 (4th Cir. 2003). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta*, 330 F.3d at 634.

Defendants' actions are not actionable unless, "in light of preexisting law the unlawfulness of those action is apparent." *Iko v. Shreve*, 535 F. 3d 225, 238 (4th Cir. 2008) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "We do not require of such officials the legal knowledge culled by the collective hindsight of skilled lawyers and learned judges, but instead only the legal knowledge of an objectively reasonable official in similar circumstances at the time of the challenged conduct." *Johnson v. Caudill*, 475 F. 3d 645, 650 (4th Cir. 2007).

Further, the law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in §1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983); *see also Trulock v. Freeh*, 275 F. 3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit). "Section 1983 liability on the part of the supervisory defendants requires a showing that: (1) the supervisory defendants failed promptly to provide an inmate with needed medical care, (2) that the supervisory defendants deliberately interfered with the prison doctors' performance, or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." *Miltier v. Beorn,* 896 F.2d 848, 854 (4th Cir. 1990) (internal citations omitted); *see also Slakan v. Porter,* 737 F.2d 368, 372 (4th Cir. 1984).

According to the allegations of plaintiff, Maynard, Stouffer, Shearin, and Bishop had no personal involvement in the incident of September 30, 2011.  The claims against them are clearly founded on supervisory liability.  Plaintiff does not point to any action on the part of these supervisory defendants that interfered with his medical care, and as such his claims against them shall be dismissed.

Additionally, plaintiff fails to meet the first prong of an Eighth Amendment claim.  He does not demonstrate that he was suffering from an objectively serious medical need.  Certainly, plaintiff had a need for his eyeglasses.  But, there is no evidence that plaintiff's prescription for eyeglasses was a medical order issued to treat a serious medical need.  Plaintiff provides no medical conclusions of a clinician, expert reports, or medical records to support any claim that, without his eyeglasses, he could not function, or that a lapse of three and a half months, until new eyeglasses were provided, constituted deliberate indifference to a serious medical need.

Moreover, there is no evidence that plaintiff suffered any real harm as a result of defendants' actions. Plaintiff asserts that the denial of eyeglasses caused him physical pain, but he offers nothing to support his allegations. Plaintiff does not show that he was in any apparent distress during the time he was without glasses. Copies of his medical records during the time at issue reveal no complaints of pain arising from the lack of glasses.

Even assuming that the objective component of the Eighth Amendment violation were satisfied, plaintiff  has not alleged facts sufficient to establish the subjective component—that defendants acted with a culpable state of mind.  There is no evidence that prison officials demonstrated obduracy or wantonness, rather than inadvertence or error in good faith.  *See Wilson*, 501 U.S. at 298–99.  As the Court noted in *Whitley v. Albers,* 475 U.S. 312, 321-22 (1986) (citation omitted):

"Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." That deference extends to ... prophylactic or preventive measures intended to reduce the incidence of ... breaches of prison discipline.

The denial of eyeglasses to plaintiff during plaintiff's housing in the SOH was not left to the discretion of correctional personnel or applied on an ad-hoc basis. Rather, it is a policy uniformly applied to all SOH inmates who, like plaintiff, demonstrate a desire to harm others or themselves. All property is confiscated from SOH inmates in order to protect them and others from harm. There is no evidence that defendants acted in anything but good faith to maintain order on the tier and protect inmates and officers from risk of assault. The confiscation of property for SOH inmates does not constitute a constitutional violation, for it is justified, as discussed above. *See Turner v. Safley,* 482 U.S. 78 (1987) (holding that a prison regulation which impinges on an inmates' constitutional rights is valid if it is reasonably related to legitimate penological interests).

Even though it appears plaintiff's glasses were lost during his transfer to SOH and then his return to NBCI, necessitating the replacement, such loss of property does not state a constitutional claim. In the case of lost or stolen property, sufficient due process is afforded to a prisoner if he has access to an adequate post-deprivation remedy. *See Parratt v. Taylor*, 451 U. S. 527, 542-44 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U. S. 327 (1986). Plaintiff may avail himself of remedies under the Maryland Tort Claims Act and through the Inmate Grievance Office. The right to seek damages and injunctive relief in Maryland courts constitutes an adequate post deprivation remedy. *See Juncker v. Tinney*, 549 F. Supp. 574, 579 (D. Md. 1982) (sufficient due process afforded through post deprivation remedies available in the Maryland courts for personal injury matters).

Plaintiff cannot meet his burden on the Eighth Amendment claim. Thus, defendants are entitled to summary judgment in their favor.

**C.**     Access to Courts

To the extent plaintiff alleges that the confiscation of his glasses prevented him from filing lawsuits, his claim fails. Prisoners have a constitutionally protected right of access to the courts. *See Bounds v. Smith*, 430 U. S. 817, 821 (1977). However:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U. S. 343, 355 (1996).

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 355). "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis,* 518 U.S. at 349. Plaintiff has not alleged, much less demonstrated, any injury to his filing or litigating cases due to his being deprived of glasses for several months.

**D.**     Retaliation

Plaintiff claims that defendants took his glasses in retaliation for his threatening to file a lawsuit against them. In order to prevail on a claim of retaliation,  plaintiff  "must allege either

that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). "'A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone.'" *Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983)); see *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996) (conclusory allegations of retaliation insufficient to state claim). Plaintiff offers nothing in support of his claim, other than self-serving conclusory averments. Nor does the record suggest that defendants acted in the manner alleged. Indeed, the evidence before the court refutes plaintiff's allegation of retaliation.

All inmates assigned to SOH who have threatened self harm and/or the ability to create a weapon have their glasses taken in an effort to prevent the inmate from harming themselves, other inmates, or staff. There is no indication that the glasses were confiscated, as plaintiff alleges, when he first was returned to his cell on September 30, 2011, after he broke away from his escorting officer. Nor is there any indication as to what happened to plaintiff's glasses after they were lost or confiscated during the incidents of September 30, 2011.

Defendants aver that they did not confiscate plaintiff's eyeglasses, as alleged by plaintiff. Without assessing the credibility of the defendants, it is undisputed that, upon plaintiff's request to replace his glasses, the glasses were replaced in a timely manner. "In the prison context, we treat [claims of retaliation] with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." *Cochran v. Morris*, 73 F.3de 1310, 1317 (4th Cir. 1996). Plaintiff cannot prevail on this claim.[7]

---

[7] Having found no constitutional violation, the court need not consider defendants' claim that they are entitled to qualified immunity.

A separate Order follows.


February 4, 2015                              _____/s/_____
Date                                         Ellen Lipton Hollander
                                             United States District Judge